**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | | |
|---|---|---|
| WILLIAM GRAHAM MAX GOGGANS, | ) | |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **Violation of Title VII (Gender):** |
| vs. | ) | **Violation of the ADA; and** |
| | ) | **Slander Per-Se** |
| HHC SOUTH CAROLINA, INC., d/b/a | ) | |
| LIGHTHOUSE BEHAVIORAL HEALTH | ) | |
| HOSPITAL, UNIVERSAL HEALTH | ) | |
| SERVICES, INC. and | ) | |
| UHS OF DELAWARE, INC., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |
| _____ | ) | |

The plaintiff, complaining of the acts of the defendants, alleges as follows:

**PARTIES AND JURISDICTION**

1.    That plaintiff is a resident and citizen of the County of Georgetown, State of South Carolina.

2.    That, upon information and belief, the defendant HHC South Carolina, Inc. d/b/a Lighthouse Behavioral Health Hospital ("defendant" or "LBHH") is a South Carolina corporation doing business and maintaining offices and agents in Horry and Charleston Counties in the State of South Carolina and is in the business of providing psychiatric medical services to the public.  Upon information and belief, said defendant employed plaintiff.

3.    That, upon information and belief, the defendants Universal Health Services, Inc. ("defendant" or "UHSI") and UHS of Delaware, Inc. ("defendant" or "UHSD") are foreign corporations with either both or one of said defendants having a management contract with defendant LBHH to manage LBHH and, upon information and belief, defendant UHSI and

UHSD have an ownership interest and/or control over defendant LBHH (and its employees) and also employed plaintiff and/or controlled plaintiff's employment. Both defendants do business and maintain offices and agents in the Counties of Horry and Charleston in the State of South Carolina.

4. That this court has federal question jurisdiction of the above-styled action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); the ADA Amendments Act of 2008 ("ADAAA" and collectively referred to as the "ADA"); 42 U.S.C. § 12203 ("ADA retaliation"); 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-5 (The Civil Rights Act of 1964 or "Title VII"); and 28 U.S.C. § 1331.

5. That venue for all causes of action stated herein lies in the district of South Carolina, Florence Division, in that, pursuant to 28 U.S.C. § 1391(b), the parties reside in the said district, and a substantial part of the events giving rise to plaintiff's claims occurred here.

## CONDITIONS PRECEDENT

6. That plaintiff has exhausted all administrative remedies and conditions precedent, including timeliness, deferral and all other jurisdictional requirements necessary for the maintenance of the foregoing action, all of which are more fully described below.

7. That on or about May 16, 2023, and as a result of defendants' discriminatory conduct, all of which is more fully described below, plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon gender, disability and retaliation in relation to his termination from the defendants.

8. That on or about December 4, 2023 plaintiff received a Notice of Right to Sue from the EEOC regarding the Charge of Discrimination described in Paragraph 7 above.

9.     That as such plaintiff has timely filed this action within ninety (90) days of the date on which he received the Notice of Right to Sue described above in Paragraph 8.

## FACTUAL ALLEGATIONS

10.     That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 9 hereinabove as fully as if set forth verbatim.

11.     That plaintiff is a male.

12.     That for most of his life plaintiff has suffered from the following impairments:  (1) Aspergers Syndrome (or high functioning autism); (2) depression; (3) anxiety; and (4) attention deficit hyperactivity disorder ("ADHD").  All of these impairments are chronic, and they have all been formally diagnosed.  Plaintiff estimates he has suffered from high functioning autism for about thirty (30) years, or since early childhood, and from the remaining three (3) impairments for at least the last fifteen (15) years or longer.

13.     That plaintiff treats the above impairments by taking several different medications, including Cymbalta for depression and anxiety, Buspirone for anxiety, and Strattera for ADHD.  Plaintiff also battles the above impairments by regularly attending therapy sessions.

14.     That the above impairments significantly limit plaintiff in, among other things, the major life activities of sleeping, eating, communicating, focusing, concentrating, social interaction, comprehension, and learning.  Still, despite these serious and chronic impairments, in 2005 plaintiff graduated from high school; in or around 2011-2013 plaintiff attended Horry-Georgetown Technical College where he earned an Associate's Degree in Science; in or around 2015 plaintiff ultimately graduated from Coastal Carolina with a Bachelor's Degree in Sociology; and in or around 2022, plaintiff obtained his Master's Degree in Social Work from the University of South Carolina.

15.     That thereafter plaintiff has been able to perform social worker related jobs with no issues.  For example, in or around 2018-2021, plaintiff worked as a caregiver at St. Gabriel of Murrells Inlet in Murrells Inlet, South Carolina where plaintiff's employer accommodated him by allowing him to take extra breaks when plaintiff felt overwhelmed and anxious at work.

16.     That to illustrate the chronic and serious nature of plaintiff's impairments, the combined effects of his Aspergers, ADHD and anxiety impairments make it extremely difficult for plaintiff to concentrate and to learn.  This circumstance caused plaintiff significant problems at school where the ability to concentrate and learn were required in order for him to pass the courses and to graduate.  As a result of the above limitations, plaintiff could not listen to a teacher's verbal presentation and take notes at the same time, as one task would interfere with his ability to perform the other task in a meaningful way.  Thus, when plaintiff tried to do the tasks at the same time, he would not learn anything from the verbal presentation because he was too occupied trying to take notes.  And, plaintiff would not learn anything from the notes later when it came time to study for and take tests because the notes would be incomplete as plaintiff was trying to listen to the teacher when he took them.  So plaintiff learned next to nothing in the short term at the lecture and then later, his notes were of little value because they were not legible and they were hard for the plaintiff to understand (and, thus, interfered with plaintiff's long-term comprehension).

17.     That as a result, throughout high school and college, the various schools plaintiff attended provided plaintiff with a reasonable accommodation – they allowed plaintiff to bring another person to class with him so that the said person could take notes during the teacher's verbal lesson, which allowed plaintiff to focus solely on the teacher's verbal

presentation.  This significantly improved plaintiff's ability to learn from the instructor's verbal presentation (since he did not have to concentrate on taking notes).  Then, later when it came time to review the class notes, they were in a neat and organized form, allowing plaintiff to likewise learn from the class notes, for example, later when he was preparing for a quiz or test.

18.    That by merely delegating one (1) of the two (2) tasks to another person, plaintiff was able to sufficiently concentrate and learn from both the lecture and the handwritten notes.  In fact, this accommodation played a significant role in plaintiff's ability to successfully graduate from each school.

19.    That another example of the seriousness (and complexity) of plaintiff's Aspergers and anxiety impairments is that plaintiff has a difficult time ascertaining the emotions and nonverbal ques of others in a work or social environment.  For example, it would not be unusual for a person suffering from plaintiff's impairments to make what others may perceive as an "out-of-place" remark during a conversation with a coworker, supervisor, or friend or to misinterpret a comment or gesture or to become easily agitated when provoked.

20.    That in or around August of 2021 plaintiff first began to work at the defendants as an unpaid intern through the USC Social Work program as a requirement to obtain his Master's Degree.  The internship was slated to last for about eight (8) months, or until around April of 2022.  In his role as an intern, plaintiff was trained by Lissa Everett ("Everett"), the Assistant Chief Clinical Director at the time (and a social worker), and plaintiff reported to both Everett and to Everett's supervisor, Sarah Anderson ("Anderson"), the Chief Clinical Director.

21.    That in or around January of 2022, Anderson left the position and defendants promoted Everett to be the new Chief Clinical Director.  Defendants did not hire anyone to replace Everett in her Assistant Chief Clinical Director position so, as of in or around

January of 2022, plaintiff reported directly to Everett in Everett's role as Chief Clinical Director. Everett, in turn, reported to the CEO of the company, Chris Little ("Little"). Otherwise, Chad Hutchison ("Hutchison") served as the defendants' Director or Head of Human Resources and James Wydock ("Wydock") served as the defendants' CFO at the time.

22.    That as an unpaid intern plaintiff occupied a therapist role, mainly assessing patients in the adult unit and then later in the adolescent unit. During plaintiff's eight (8) month internship he did not receive any performance evaluations, and he was never disciplined in any manner – formal or informal. On the contrary, several times during plaintiff's internship, Everett told plaintiff that he was doing a good job. Plaintiff thought the internship was great; he enjoyed the work there and the people; and he was learning a lot and gaining experience in a job that was consistent with his college degree.

23.    That in or around April 2022, plaintiff's internship at defendants ended. However by on or about May 17 or 18, 2022, defendants offered plaintiff a full-time, paid position as a Geriatric Social Worker, working on defendant Lighthouse's geriatric unit. Of course plaintiff accepted the position.

24.    That once plaintiff was hired as a full-time employee, he continued to report to Everett in her role as Chief Clinical Director and Everett continued to report to the CEO, Little. Hutchison was still there in his role as Human Resources Director and Wydock was still the CFO.

25.    That as a social worker in the geriatric unit, plaintiff had no one under him and no supervisory duties. However, there were about ten (10) to twelve (12) other social workers spread among four (4) different departments or units: the adolescent unit which housed about three (3) social workers; the adult unit which housed about four (4) social workers; a drug

and alcohol dual diagnosis unit that typically had four (4) social workers; and the geriatric unit where plaintiff worked, which generally had one (1) social worker.  Out of all of the above therapists or social workers, only two (2) were male:  plaintiff and an African-American male.

26.    That from the start plaintiff was extremely busy as he was assigned more than the usual number of patients or case files.  Specifically, pursuant to industry standards, each social worker should have no more than about ten (10) cases (or patients), yet plaintiff was assigned between twelve (12) to sixteen (16) patient files.  Moreover, plaintiff had to take over files that had not been fully completed by his predecessor, making the issue even more pronounced.

27.    That plaintiff's start as a full-time, paid social worker at defendants was a fast and, at times, overwhelming one for plaintiff, given it was his first social worker job; given plaintiff's impairments described above; and given his case load.  Still, plaintiff understood it was a business; he was excited to have the job, and so plaintiff dove into his work, ready to do what was necessary to succeed at defendants.  Despite plaintiff's strong resolve and willingness to put in the hours, there were times when the increased workload, along with his Aspergers, anxiety and other impairments, caused plaintiff to become anxious and overwhelmed at work.

28.    That to be sure, plaintiff always performed his full-time social worker job at defendants in a satisfactory fashion and otherwise maintained an excellent employment record there.  To this point, plaintiff was learning quickly; he never received any type or kind of discipline, formal or informal (during his entire employment at defendants) and, though plaintiff never received a formal employment evaluation during his time as an intern or as a full-time employee at defendants, he was told by management, namely his supervisor, Everett, and the

CEO, Little, that he was doing a good job. Consistent with this praise, plaintiff regularly received positive patient surveys.

29.    That the only real issue plaintiff had at defendants was the increased case load assigned to him and its impact on his impairments. Naturally, the increased number of patients assigned to plaintiff increased the amount of work plaintiff had to perform. This, in turn, exacerbated some of plaintiff's impairments, mostly because he became more anxious at work and experienced panic attacks there, as well as heightened symptoms from plaintiff's Aspergers syndrome.

30.    That this circumstance, and plaintiff's attempts to remedy it, led plaintiff to reveal the nature of his impairments to several management employees at defendants on several different occasions, and it ultimately led plaintiff to request reasonable accommodations at defendants – all of which were denied.

31.    That plaintiff first revealed his impairments to defendants in or around October or November of 2021, when he was still working as an intern, on a day where plaintiff felt overwhelmed and anxious, and was concerned he may have been too stern with a patient. On this occasion, plaintiff disclosed to Anderson (the Chief Clinical Director at the time) that he suffered from severe anxiety and Aspergers and that his impairments may have been responsible for the way he felt that day. Around that same time plaintiff sent a text message to Anderson telling her he was too anxious to lead his group therapy session and asking Anderson if she would temporarily fill in for him on that occasion, a task Anderson agreed to undertake. Plaintiff still has the text messages which evidence his disclosures and requests to Anderson on that occasion.

32.    That next, in or around May of 2022, plaintiff disclosed his impairments in writing to defendants when he was first hired as a full-time geriatric social worker as defendants required plaintiff (as part of the onboarding process) to get a medical evaluation.  Pursuant to this requirement, on or about May 10, 2022, plaintiff was examined by a physician at Doctors Care. In the process, the physician filled out a medical form summarizing the results of the exam.  The medical form pertaining to the exam states that plaintiff suffers from depression, anxiety and ADHD and that he was prescribed Cymbalta and Buspirone for anxiety and depression and Strattera for ADHD.  Either the examining physician or plaintiff also checked a box on the form which states that plaintiff knew of no medical or physical conditions that would limit his job activities.  Shortly thereafter, plaintiff brought the above-described medical form to Hutchison putting defendants on notice that he suffered from anxiety, depression and ADHD.  In fact, plaintiffs recall Hutchison specifically examining the form when plaintiff gave it to him.

33.    That plaintiff again advised the defendants about his impairments for a third time sometime during the last two weeks of June of 2022, when plaintiff's supervisor, Everett, was out of work on vacation and she had instructed plaintiff to raise any concerns he may have had while she was away with the CEO, Little.  Thus, on this occasion plaintiff requested to meet with Little to discuss the issue; Little granted the request and the two met. During the meeting plaintiff disclosed his impairments to Little, and the effect the increased work had on them, and his emotional health in general.

34.    That on that occasion, Little made at least two (2) relevant and significant remarks to plaintiff:  First, in response to plaintiff's statement that his workload was overwhelming, Little actually agreed, remarking that no therapist (or social worker) should have more than ten (10) cases or patient files at a time – when plaintiff had twelve (12) to sixteen (16)

such files.  Second, Little advised plaintiff that plaintiff certainly seemed to be doing a good job, as plaintiff routinely received positive patient surveys.  The above confirms that plaintiff was meeting the defendants' legitimate performance expectations despite being overworked at defendants and despite plaintiff's disabilities.  In general, plaintiff met with the CEO to make him aware of the situation and to ask him for help.

35.    That while plaintiff did not request a specific accommodation at the meeting, plaintiff did inform the CEO of his impairments and the need to have a decreased workload – which, in reality, could only come in two (2) ways:  by reducing plaintiff's workload, or by providing plaintiff with extra help.  During the meeting plaintiff asked if he could leave work early that day due to his anxiety.  Little granted the request.  After plaintiff's meeting with Little, Little did not take any action to accommodate plaintiff or to enter into dialogue (or engage in any interactive process) with plaintiff about his impairments and potential accommodations.

36.    That the following day, plaintiff met with Hutchison to check in, during which time Hutchison told plaintiff that he and the defendants were worried about plaintiff and told plaintiff that there were therapists on hand that he could consult with.  Plaintiff declined the invitation, stating he was already seeing a therapist.

37.    That plaintiff disclosed his impairments to defendants for a fourth time in or around the last week of June or the first week of July, 2022, when plaintiff met with his immediate supervisor, Everett, about his increased workload, his impairments, and the need for some help.  Though Everett was already aware of plaintiff's impairments, plaintiff reminded her that he suffered from, among other things, Aspergers Syndrome, anxiety, and ADHD.  Plaintiff also explained to Everett that, with these impairments, it was difficult to treat the excess number of patients assigned to him as he was becoming more anxious and having panic attacks at work.

38.    That in the end, plaintiff asked Everett for specific and reasonable accommodations – to be permitted to bring patient files home with him so he could finish his paperwork at night at home with less pressure and stress and/or that he be permitted to leave work early on Fridays and then make the time up by working on Saturday – another measure that would lessen plaintiff's anxiety at work. Plaintiff also assured Everett that, if permitted to do so, he would safeguard the client files while in his possession.  In response, Everett and defendants denied plaintiff's request for accommodations, with Everett stating she did not believe that bringing work home would help and that plaintiff could not work on Saturdays because of his current pay rate and the number of hours he worked.

39.    That after rejecting plaintiff's request for a reasonable accommodation, neither Everett nor anyone else at defendants entered into further dialogue or otherwise initiated any type of interactive process with plaintiff regarding his impairments and potential accommodations – all as required by the ADA.

40.    That thereafter, plaintiff continued to work hard for defendants and plaintiff continued to perform his job well, receiving praise from his supervisors, continuing to receive positive patient surveys, and never being disciplined – all despite plaintiff's impairments, the fact that defendants had assigned a number of cases to plaintiff that was well above industry standards and the standards of defendants' own CEO, Little, and despite the fact that plaintiff was never accommodated by defendants.

41.    That the only negative issue for plaintiff at Lighthouse was that the increased workload without accommodations made the symptoms of his impairments worse which made it more difficult for plaintiff to perform the duties of his job.  While plaintiff still

performed his job in a manner that met defendants' expectations, plaintiff could have performed his job even better had defendants granted his requests for accommodations.

42.     That matters came to a head on or about Monday, July 18, 2022 when plaintiff attended his daily treatment meeting with his treatment team.  During these meetings plaintiff would update the team on the status and conditions of his patients.  The meeting took place in the doctor's office on the 400L hall and was attended by a nurse named Betty, the treating physician, Dr. Rupa Shetty ("Shetty"), and plaintiff.  At this particular meeting, Dr. Shetty had three (3) psychiatric students with her.

43.     That the meeting began as usual without incident with the team reviewing plaintiff's patient files and, when necessary, asking plaintiff questions about them.  After reviewing three (3) or four (4) of plaintiff's files, the team began to review a female patient's file who had checked into the facility approximately four (4) or five (5) days before the meeting, reporting she had been abused by her husband.  By the time of the meeting, it was time for the patient to be discharged from the facility.  However, the patient did not want to return to her home.  At the same time, one of plaintiff's job duties involved "placement" or finding patients a place to stay or reside after they left the facility.  With this particular patient, at the time of the meeting plaintiff was in the process of completing this task, but still had not yet found a place for the patient to live.  As a part of this process, one of plaintiff's job duties further required him to seek "collateral" information on the patient, meaning contacting, interviewing and seeking information and input from persons other than the patient, such as from the patient's family members or relatives, all in an effort to find living quarters for the patient.

44.     That in this particular case, plaintiff had, after several unsuccessful attempts, called and spoken with the patient's son to obtain collateral information.  While

discussing this particular patient's file in the team meeting, Dr. Shetty first asked plaintiff if the patient had any history of substance abuse. Always familiar with his patient's files and always well prepared for these meetings, plaintiff replied in the negative, explaining the patient had reported to him that she had only used substances in high school. Dr. Shetty then asked plaintiff if he had gotten collateral information on the patient, to which plaintiff responded in the affirmative, adding that he spoke to the female patient's son. Plaintiff also added that the patient had improved significantly during her brief stay at defendants and that she was now significantly more focused and she was thinking far more clearly than she had been upon her arrival at the facility. In such a situation, the collateral information plaintiff relayed to those in the meeting regarding this patient had less value than it did with other patients who were not doing well.

45.    That as plaintiff was finishing his remarks, Dr. Shetty actually began to openly laugh at plaintiff in a snide and demeaning manner, all in front of the nurse and the three (3) medical students. As she was laughing, Dr. Shetty pointed to the three (3) medical students and stated in a sarcastic and negative manner, "Good collateral, eh?" It was clear to plaintiff that Dr. Shetty was not offering constructive criticism to plaintiff but, rather, she was mocking him in a cruel way, just to impress her students and the nurse. Plaintiff takes his position as a social worker very seriously, and he felt that Dr. Shetty's response was unprofessional and inappropriate. Moreover, from her tone and demeaner, it was clear that Dr. Shetty was making fun of plaintiff and belittling him in front of those present at the meeting. This humiliated and embarrassed plaintiff. In response, plaintiff asked Dr. Shetty what her response was supposed to mean. Dr. Shetty responded that she meant that plaintiff had not procured any collateral information on the patient at issue or on any of his patients – a false statement, as plaintiff had sought collateral information on the patient at issue by contacting her son and he had also

obtained collateral information on his other patients whose files Dr. Shetty had not yet reviewed. When plaintiff attempted to defend himself by stating there was collateral information in his patients' charts, Dr. Shetty again falsely accused plaintiff of not obtaining collateral information on any of his patients, and she said it in an antagonistic manner.

46.    That embarrassed, frustrated and attempting to defend himself from a false allegation, plaintiff told Dr. Shetty that he was doing the best he could given he had fifteen (15) or more patients who all needed placement.  Dr. Shetty tersely replied that plaintiff needed to do better.  At that point plaintiff told Dr. Shetty that he did not appreciate her making fun of him, being rude to him, and being disrespectful to him.  Refusing to let the issue go, Dr. Shetty shot back that plaintiff was the one being rude and disrespectful.

47.    That at that point plaintiff stated he was excusing himself from the meeting and that he was going to talk to the CEO, Little, about Shetty's conduct.  Continuing with her string of unprofessional and inappropriate remarks, Dr. Shetty told plaintiff to "Go ahead.  Go talk to Chris.  I have three witnesses" (referring to the medical students).  Plaintiff admits his voice was louder during this exchange than it was in normal conversation, but plaintiff was not yelling, screaming, calling Dr. Shetty names, or using profanity.  Dr. Shetty's voice was also slightly raised, but it was more her tone, demeanor and the content of her speech that offended plaintiff.

48.    That immediately after the event plaintiff tried unsuccessfully to find his supervisor, Everett, so that he could report Dr. Shetty's conduct to her.  Unable to locate her, plaintiff called and left her a message on her phone stating that he wanted to file a complaint against Dr. Shetty.  About twenty (20) minutes later, plaintiff was able to meet face-to-face with the Human Resources Director, Hutchison, about the matter.  In doing so, plaintiff told

Hutchison about Dr. Shetty's conduct during the treatment meeting at issue and stated he wanted to report Dr. Shetty or make a complaint against her for her conduct in the meeting. Hutchison told plaintiff to "hold on" and that Everett would take care of that task.

49.    That at this point plaintiff was visibly upset – crying and shaking. Plaintiff then asked Hutchison whether or not he (plaintiff) was performing his job at defendants in a satisfactory manner. Becoming somewhat guarded, Hutchison replied he did not know because he was not out on the floor where he could observe plaintiff perform his job. In the course of the meeting, plaintiff advised Hutchison that he suffered from anxiety and Aspergers Syndrome. Hutchison only responded that he did not know anything about that. Otherwise, Hutchison did not enter into dialogue with plaintiff about plaintiff's disabilities or potential accommodations or engage in any interactive process with plaintiff regarding those issues.

50.    That still in despair, about twenty (20) or so minutes after speaking to Hutchison, plaintiff was able to personally meet with the CFO, Wydock, about the issue. They met in the CFO's office, and the Business Manager was also present. Again plaintiff repeated how Dr. Shetty had behaved in the meeting earlier that morning. During the meeting Wydock acknowledged that, if plaintiff had accurately portrayed Dr. Shetty's conduct during the meeting (which he did), then, in his view, her conduct was indeed inappropriate. Shortly after the meeting plaintiff went to lunch.

51.    That after plaintiff returned from lunch he was called into Everett's office. When plaintiff got there, Everett was there along with Hutchison. Hutchison told plaintiff that they had received a complaint that he had acted inappropriately at the meeting earlier that day. Hutchison further advised that plaintiff was being suspended for three (3) days; he asked plaintiff to give him his badge; and he remarked that he did not have to tell plaintiff who complained

about him, what they said, or why plaintiff was being suspended.  Hutchison did tell plaintiff that the company would investigate the complaint and that they would get back to him in three (3) days.

52.    That apparently defendants conducted some type of investigation into the complaint made against plaintiff (presumably by Dr. Shetty).  As a part of that "investigation," defendants requested that plaintiff provide them with a written statement.  Plaintiff did as instructed and provided them with such a statement.  But in doing so, plaintiff left out the fact that he had, indeed, obtained collateral information from the patient's son – though that omission does not appear relevant.

53.    That ultimately, on or about July 22, 2022, Hutchison and Everett called and fired plaintiff over the phone, allegedly because plaintiff engaged in bullying behavior towards Dr. Shetty during the said treatment meeting that bordered on "harassment." They also referred to having a video of the incident, but plaintiff was not given the opportunity to view it. At the same time, no one processed or investigated the complaints plaintiff made against Dr. Shetty – even though plaintiff made his complaint first and even though he made it to more than one person.

54.    That after terminating plaintiff, upon information and belief defendants replaced plaintiff with Lisa DeStefano, a female with no known disabilities who plaintiff believes had been working as a counselor in defendant Lighthouse's adult unit.  Plaintiff further understands that defendants also hired another female with no known disabilities (name unknown) into his position.

55.    That plaintiff also has evidence that defendants treated at least three (3) similarly-situated female employees with no known disabilities more favorably that it treated

him: at least two (2) of these comparators were female social workers with no known disabilities – both of whom occupied the same position as plaintiff, both of whom had the same reporting structure as plaintiff, and both of whom were subject to the same work rules as plaintiff. Upon information and belief, both females had also felt mistreated by Dr. Shetty; they both felt they had endured enough of her conduct; and they both had an antagonistic or aggressive exchange with her – just like plaintiff allegedly did. Unlike in plaintiff's circumstance, one of the female social workers left work as a result of Dr. Shetty's conduct towards her. Everett called one of these female employees and, instead of firing her, asked her to **come back to work,** an offer the female employee declined. The other female employee was disciplined only by having her duties changed so that she exclusively counseled groups instead of individuals.

56.     That the third comparator is Dr. Shetty as, during the meeting in question, Dr. Shetty, a female with no known disabilities, engaged in conduct that was equal to, if not worse, than the conduct plaintiff was fired over. Indeed, plaintiff reported Shetty's conduct during the same meeting to several management-level employees and the Director of Human Resources. Yet, while defendants refused to process and investigate plaintiff's reports, it immediately processed and investigated Dr. Shetty's. Defendants quickly fired plaintiff for this alleged conduct while, upon information and belief, Dr. Shetty was not disciplined in any manner for engaging in the same or similar conduct that plaintiff allegedly engaged in and was fired over.

57.     That in addition to the above, on or about February 8, 2023 and again on or about April 27, 2023, defendants (through Hutchison) contacted plaintiff via email (through Indeed.com) and invited plaintiff to apply for an open therapist job at defendant Lighthouse. The invitation stated that plaintiff could be a good fit for the open position. Then, on or about April

5, 2023, defendant Lighthouse again contacted plaintiff via email (through Indeed.com) – this time inviting plaintiff to apply for the Director of Clinical Services position and again stating that, due to his prior work experience, plaintiff might be a good fit for the job.  According to information obtained from Indeed.com, defendants would have knowingly sent these invitations to plaintiff.  Apparently defendants were pleased with plaintiff's performance and it never really believed plaintiff engaged in a terminable offense (or they would not have sent plaintiff invitations to apply for open positions after he had been fired).

58.     That finally, as stated, out of twelve (12) or so counselors and/or social workers, only two (2) of them were male, a fact which shows defendants have a preference for female employees in the position plaintiff occupied.

### FOR FIRST CAUSE OF ACTION: VIOLATION OF TITLE VII 42 U.S.C. § 2000e-2 and 5 TERMINATION BASED ON GENDER

59.     That plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 58 hereinabove as fully as if set forth verbatim.

60.     That at all pertinent times as defined by Title VII each defendant employed fifteen (15) or more employees, including the plaintiff, and, as such, defendants are "employers" as defined by Title VII, and otherwise subject to that Act.

61.     That plaintiff is male and, therefore, a member of a protected class.

62.     That at all times plaintiff performed his job duties at defendants in a manner that met defendants' reasonable and legitimate expectations as evidenced by the total lack of discipline in plaintiff's employment file, the remarks of praise by his supervisors, and the positive patient surveys filled out by patients he treated.

63.    That despite the above, on or about July 22, 2022 plaintiff suffered adverse action at defendants when defendants fired him, without prior warning, notice or cause and for false reasons or reasons unworthy of credence.

64.    That after firing plaintiff, defendants replaced plaintiff with two (2) different females (who were, thus, outside of plaintiff's protected class) and/or defendants kept the position open.  Moreover, defendants' reasons for firing plaintiff were false and/or unworthy of credence.  Finally, other similarly situated employees outside of plaintiff's protected class who engaged in conduct similar to the conduct plaintiff was charged with were treated more favorably than plaintiff.

65.    That as such, defendants fired plaintiff because of her gender (male), all in violation of the Civil Rights Act of 1964 or Title VII.

66.    That  as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

67.    That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff seeks punitive damages from the defendants.

**FOR A SECOND CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**TERMINATION BASED UPON DISABILITY**
**AND/OR PERCEIVED DISABILITY**

68.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 67 hereinabove as fully as if set forth verbatim.

69.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA each defendant employed fifteen (15) or more employees, including the plaintiff, and, thus, are "employers" as defined by said Act and otherwise subject to it.

70.    That as a result of plaintiff's Aspergers Syndrome, anxiety, depression and ADHD, plaintiff was (and is) substantially limited in one or more major life activity including, but not limited to eating, sleeping, thinking, focusing, concentrating, social interaction,  comprehension, and learning.  Moreover, the impairments identified above are chronic, long-term and likely lifetime impairments that will be with plaintiff for the rest of his life.

71.    That despite the above, plaintiff could perform the essential duties of his job at defendants with reasonable accommodations in the form of, among other things, a reduced caseload consistent with industry standards, and/or assistance or extra help, short breaks at work during panic attacks, permission to bring patient files home so that he could work on them in the evening without the stress of the workplace and/or leave work early on Fridays and make up for it on Saturday, again to reduce the amount of stress at work.

72.    That as such, the plaintiff is disabled as defined by the ADA/ADAAA. Moreover, the defendants regarded or perceived plaintiff as being disabled as defined by that Act, as they erroneously believed plaintiff's disabilities, or perceived disabilities, prevented him from performing the essential duties of his social worker position at defendants.

73.    That as alleged, plaintiff performed his job duties at defendants at a level that met defendants' legitimate expectations as he had never been disciplined at defendants, his supervisors routinely told plaintiff he was doing a good job, and plaintiff regularly received positive patient surveys from the patients he treated.

74.    That despite the above, defendants fired plaintiff without prior warning, notice, discipline or cause (even though the defendants have and utilize a progressive discipline policy) and for false reasons and/or reasons unworthy of credence.

75.    That in reality, defendants fired plaintiff because plaintiff is disabled and/or because defendants perceived or regarded plaintiff as disabled. In addition, defendants erroneously believed plaintiff's disabilities and/or perceived disabilities rendered him unable to perform the duties of his job.

76.    That not only were the reasons given to plaintiff for his termination false and/or unworthy of credence, defendants treated similarly-situated employees outside of plaintiff's protected class more favorably than it treated plaintiff; defendants fired plaintiff within two (2) to three (3) weeks after plaintiff requested an accommodation under the ADA; defendants replaced plaintiff with at least two (2) females who did not suffer from known disabilities; and after they fired plaintiff, defendants then offered plaintiff jobs on two (2) separate occasions.

77.    That as such, defendants violated the ADA/ADAAA by firing plaintiff because of his disabilities and/or because of his perceived disabilities and because they erroneously believed plaintiff's disabilities and/or perceived disabilities prevented him from performing the essential duties of his job at defendants.

78.    That as a result of defendants' actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

79.    That defendants' actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendants.

**FOR A THIRD CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**RETALIATION**

80.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 79 hereinabove as fully as if set forth verbatim.

81.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA each defendant employed fifteen (15) or more employees, including the plaintiff, and, thus, are "employers" as defined by said Act and are otherwise subject to it.

82.    That plaintiff last engaged in protected activity under the ADA/ADAAA on or about the end of June or beginning of July 2022 by requesting reasonable accommodations under the ADA/ADAAA.

83.    That within three (3) weeks of plaintiff's protected activity, defendants suspended and fired plaintiff without warning, notice, prior discipline or cause.  Thus, a causal

connection exists between plaintiff's protected activities and his termination, based on the above timing evidence.

84.    That as such, defendants violated the ADA by firing plaintiff in retaliation for engaging in protected activity under the ADA/ADAAA (in the form of requests for reasonable accommodations) and, as such, defendants unlawfully retaliated against plaintiff, all as prohibited by the Retaliation provision contained in the said Act (42 U.S.C. § 12203).

85.    That as a result of defendants' actions as set forth above, plaintiff has been damaged in the form of lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, pain and suffering, loss of enjoyment of life, anxiety, depression, inconvenience, mental anguish, embarrassment, humiliation, loss of professional standing, character and reputation, physical and personal injuries and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

86.    That defendants' actions as described above were undertaken intentionally, willfully, wantonly, knowingly and with reckless indifference to plaintiff's federally protected rights and, therefore, plaintiff is entitled to recover punitive damages from the defendants.

**FOR A FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE ADA/ADAAA**
**FAILURE TO ENGAGE IN DIALOGUE/**
**INTERACTIVE PROCESS**

87.    That plaintiff hereby repeats and realleges each and every allegation in Paragraphs 1 through 86 hereinabove as fully as if set forth verbatim.

88.    That as alleged above, at all pertinent times as defined by the ADA/ADAAA each defendant employed fifteen (15) or more employees, including plaintiff, and, thus, are "employers" as defined by said Act and otherwise subject to it.

89.    That as alleged above, plaintiff is disabled as defined by the ADA/ADAAA and/or defendants perceived him as such.

90.    That on many occasions plaintiff conveyed specific facts about his impairments or disabilities to his immediate supervisor and other management and Human Resource level employees at the defendants, including, but not limited to, the name or identity of his impairments, the symptoms of them, and his prognosis.    Moreover, plaintiff's direct supervisor observed plaintiff having symptoms from his disabilities at work on more than a few occasions.

91.    That in addition to the above, plaintiff repeatedly requested reasonable accommodations from defendants as set forth above.

92.    That yet on those occasions when plaintiff imparted medical information to the defendants or when he requested a reasonable accommodation from the defendants, no one at the defendants engaged in dialogue or in any other interactive process with plaintiff, all as required by the ADA/ADAAA, to determine the nature and extent of plaintiff's disabilities and potential accommodations for said disabilities – accommodations that would have allowed plaintiff to perform the essential functions of his job and to keep his job.

93.    That instead, when plaintiff provided defendants with medical information concerning his disabilities, or whenever he requested reasonable accommodations defendants would *not* engage in dialogue with the plaintiff but, instead, defendants became irritated and resentful towards plaintiff for having said disabilities and they would deny plaintiff's requests for reasonable accommodations.

94.    That defendants violated the ADA/ADAAA by refusing to enter into dialogue with the plaintiff and/or by refusing to involve him in any type of interactive process to

determine the nature and extent of his disabilities and potential reasonable accommodations and by refusing to accommodate plaintiff, all of which resulted in plaintiff's termination from defendants.

95.    That as a result of the above, plaintiff has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, and has suffered severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, physical and personal injuries, and plaintiff further seeks his reasonable attorney's fees and costs and prejudgment interest.

96.    That the defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the federally protected rights of the plaintiff, and therefore plaintiff is entitled to recover punitive damages from the defendants.

## FOR A FIFTH CAUSE OF ACTION: SLANDER PER-SE

97.    That plaintiff hereby repeats and realleges each and every allegation contained in Paragraphs 1 through 96 hereinabove as fully as if set forth verbatim.

98.    That as specifically alleged in Paragraphs 42 through 47 above, defendants (by and through Dr. Shetty) published false and defamatory statements about the plaintiff to nurses and medical students at defendants' facility without a need to know by telling them plaintiff was unfit; that he was an inferior employee there who could not competently perform the duties of his job; while at the same time belittling and demeaning plaintiff.

99.     That immediately thereafter, defendants suspended plaintiff, but not Dr. Shetty, and conducted an investigation into the incident, an investigation that many, if not most, employees were aware of at defendants.

100.     That within a week of the incident defendants fired plaintiff while retaining Dr. Shetty, a circumstance which gave the employees at defendants a false impression that plaintiff had engaged in some type of terminable work rule violation and that he was unfit to perform the duties of his given job at defendants and that he was otherwise not a good employee.

101.     That plaintiff was extremely competent in the performance of his job at defendants; plaintiff took great pride in his job there; and he took the duties of his job at defendants very seriously.

102.     That all of the above statements or publications made by Dr. Shetty (acting in the course and scope of her duties at defendants and on defendants' behalf) were all false, were all made about the plaintiff, and were damaging to plaintiff's reputation.

103.     That all of the publications referred to above were about the plaintiff, were false, and were made by the defendants without justification, without privilege and with implied and actual malice.

104.     That the statements about the plaintiff enumerated above constitute slander per-se in that they allege plaintiff is unfit to competently carry on in his given trade and profession and that he was otherwise an inferior employee.

105.     That defendants' publications as set forth above had a defamatory and slanderous meaning, impeached the honesty and integrity of the plaintiff and thereby exposed him to public hatred, contempt and ridicule and caused him to be shunned and avoided and to suffer loss

of his reputation, embarrassment, humiliation, emotional distress, pain and suffering and loss of enjoyment of life.

106.    That defendants' actions as alleged above resulted in special, general and presumed damages to the plaintiff.

107.    That as a direct result of defendants' conduct as alleged above, plaintiff has suffered damages in the form of loss to his reputation, lost back and future wages, income and benefits, costs associated with finding other work, psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to professional standing, character and reputation, embarrassment, humiliation, personal and/or physical injury and/or illness and prejudgment interest.

108.    That defendants' conduct as described above was undertaken by defendants intentionally, willfully, wantonly, recklessly, maliciously and with utter disregard for the protected rights of the plaintiff and, therefore, plaintiff is entitled to recover punitive damages from the defendants.

WHEREFORE, plaintiff prays for the following relief against defendants:

 (a)  As to plaintiff's First, Second, Third and Fourth Causes of Action under Title VII and the ADA, plaintiff seeks damages for such amount of actual and special damages as the trier of fact may find, (including lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, including his

reasonable attorney's fees, prejudgment interest and for such other and further relief as the court deems just and proper; and

(b)  As to plaintiff's Fifth Cause of Action for slander per-se, for such amount of actual and special damages as the trier of fact may find, (including loss to plaintiff's reputation, lost back and future wages, income and benefits, expenses associated with finding other work, severe psychological harm, emotional distress, anxiety, depression, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, embarrassment, humiliation, loss to professional standing, character and reputation, and physical and personal injuries), punitive damages, the costs and disbursements of this action, prejudgment interest and for such other and further relief as the court deems just and proper.

HITCHCOCK & POTTS

By:  _s/A. Christopher Potts_
Federal ID No.:  5517
222 West Coleman Blvd., Ste. 124 #11
Mt. Pleasant, SC 29464
Telephone:  (843) 577-5000
Email:  cpotts@hitchcock-potts.com
**Attorneys for the Plaintiff**

Charleston, South Carolina
February 27, 2024

28